## Moise v. Burton, et al.

(Decided December 15, 1922.)

Appeal from Jefferson Circuit Court
(Common Pleas, Fourth Division).

1. Damages—Sale of Property—Mental Capacity.—One claiming damages from his vendee on the ground of mental irresponsibility superinduced by melancholia causing a prostration of the will power, must show by clear and convincing evidence that his vendee knew of his mental irresponsibility and with this knowledge, or opportunity for such knowledge, took advantage of his condition and purchased the property for less than its reasonable value.

2. Damages—Sale of Property—Mental Capacity.—One who has mind and memory sufficient to know and recall all the details of a large business and who has enjoyed a wide business experience, and who, in the quiet of his home engages a competent and upright person to act as his agent in the negotiation of stocks, and through this means negotiates his holdings in a corporation, is, in a suit for damages for alleged loss sustained by him in the sale of the stock, under the burden of proving that his mental condition was such that he did not have mind and memory sufficient to understand and appreciate in a reasonable degree the nature, character and extent of the transaction.

3. Contracts—Mental Capacity.—In a trial where the sufficiency of mentality of one of the parties to make a contract is submitted to the jury, and their is evidence by several alienists and specalists on mental and nervous diseases to the effect that the party did not have mental capacity sufficient to enter into such contract or to know and appreciate its nature and extent, and there is much evidence to the contrary made up of the testimony of non-experts as to the circumstances, acts and conduct of the person whose mental condition is in question, it is for the jury to say, from all the evidence, whether such person was possessed of sufficient mental capacity to enter into such contract, and the verdict of the jury finding for the defendant is a finding that the plaintiff had mind and memory sufficient to enter into the contract in question.

4. Trial—Instructions.—A party to a common law action may offer as many instructions as to him seem proper, but the court should give only such instructions as clearly and concisely state the law of the case, and this may be done by embodying in one instruction the substance of that contained in several offered by a party.

5. Trial—Instructions.—Where an instruction given by the court contains in substance what was contained in the two or more in-

structions offered by a party, such party is not in position to complain.

SHACKELFORD-MILLER and BASKIN & VAUGHAN for appellant.

HUMPHREY, CRAWFORD & MIDDLETON for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming:

Appellant Moise commenced this action in the Jefferson circuit court against G. R. Burton, Granville L. Burton and Ferrill Burton, for $180,000.00 damages, alleging that in May, 1918, he was the owner of 400 shares of capital stock of the Crutcher & Starks corporation, of the value of $240,000.00, and which stock appellees Burtons, through misrepresentation, concealment and fraud, purchased from the said Moise for $60,000.00, at a time when the said Moise was in such poor condition of health that his nervous system was shattered and he was suffering from nervous prostration to such an extent that he was unable to grasp or understand his business affairs or the value of his stock in said corporation, or the nature, contents and extent of the transaction through which he conveyed his stock to the appellees, and that he would not have so transferred his stock to appellees but for his physical weakness and mental irresponsibility which rendered appellant easily misled and susceptible to imposition at the hands of the said Burtons who, knowing his irresponsibility, took advantage thereof and obtained from him for a wholly inadequate consideration —$60,000.00—the said capital stock, when it was worth, as appellees well knew, at least $240,000.00.

The answer denies that appellant Moise was nervous or sick or irresponsible or that his mind was in any way impaired; and further denies that appellant Moise was misled, or deceived or that appellees in any way attempted to mislead or deceive him, or his agent Norvin Green, and affirmatively pleads that appellant Moise was in possession of his full mental faculties and knew and fully understood all the details of the business of the corporation of Crutcher & Starks in which he held stock and had in mind all the details of the business, including the amount and character of merchandise carried by the company, its value, indebtedness of the company, as well as its income, profits from the business, the salaries of the officers, including himself and other employes; the

amount of overhead expense, the profits realized for all preceding years since the business had been conducted as a corporation, and the dividends that had been declared and paid through those years, and all other information which any other person connected with the business had or could obtain, and that in May, 1918, the business was dull and one of their branch stores at Camp Taylor had proved unprofitable and altogether business conditions were unsatisfactory; the said 400 shares of the capital stock of the said company were worth no more than $60,-000.00; that appellees believed and had every reason to believe that appellant was in possession of all the facts; that they made no representation concerning the value of the stock and did not conceal any fact from appellant or his agent Green, nor made any statement which was calculated to mislead or deceive either appellant or his said agent Green.

Many witnesses were called on both sides, among them being several alienists and specialists on nervous and mental diseases, and they as witnesses were examined and cross-examined at great length by counsel on each side.

The case being submitted to the jury upon the question of fact, under instructions of which complaint is made, the jury found and returned a verdict for the Burtons, and judgment being entered in accordance therewith, Moise appeals.

While the petition sets out many grounds for a recovery the case resolves itself into but two questions. For instance, in brief of counsel for appellant it is said: "We have shown, we think unmistakably, that Moise had capacity to know what he was doing, to understand what was said to him about business, to make a statement of his affairs and to recollect with considerable, if not entire accuracy, the details of his former transactions." In the next paragraph of the brief it is further said: "Let us again concede that there is no difference between defendants' proof and the plaintiff's proof in the above particulars," the "above particulars" being that Moise had capacity to know what he was doing and to understand what was said to him about business, to make a statement of his affairs and to recollect with considerable if not entire accuracy the details of his former transactions.

It is next insisted in the same brief: "We have shown without contradiction that Moise had melancholia; that

the effects of melancholia is to paralyze one's will power or power of resistance, and this is demonstrated by the testimony of Green, whereby he says that he and Mrs. Moise took Moise to the office of Crutcher & Starks against his will and coerced him into signing the bill of sale for the stock.'' This evidence, according to the same brief and according to appellants, was given by Dr. Meacham of an Asheville sanatorium; Dr. Fournodigiff, of the Battle Creek sanatorium; Dr. Gardner, late of the Lakeland asylum, and by Dr. Sprague, of a sanatorium at Lexington, all prominent and well known alienists and specialists in mental and nervous troubles.

Appellant insists through his counsel that he was entitled to recover upon showing (a) his mental irresponsibility; (b) appellees' knowledge of that fact; and (c) that the sale was at an inadequate price.

Appellant Moise was a very industrious, active and painstaking business man who had been connected with Crutcher & Starks Corporation for some years as credit man and had a large share in the management of the business and in looking after many of the details. His mind was trained and alert. He was a marvel, according to one of the alienists, on the retention of details, for he testified in answer to the question as to whether Moise was the type of man that had all the details of his business at his fingers' ends, ''I should say he was a man of infinite detail; more detail to him than any man I ever saw.''

''Q. You had no doubt that he knew about the details of the Crutcher & Starks business, had you? A. I am satisfied he did. Q. Anything you would want to know about it you are sure he could have told you provided he was willing to tell you? A. I think he might have answered any question I might have seen fit to ask. Q. I am not asking you as to whether you think he should disclose his personal business to you, but I am asking you of your knowledge of Mr. Moise at the time whether in your opinion he could not have answered any question you might have asked him relative to his business, that is, the actual facts about his business? A. I think I can make it strong enough for you in this way: There was no detail in any of Moise's business at that time, or at any time in the past that that man was not capable of recalling; he had a wonderful memory for details, and his

.inability to discard these details was evidence to me of his peculiar mental condition.''

Appellant Moise took sick in November, 1917, and decided to go to Asheville, N. C., to Meacham's sanatorium for treatment, and did so. While he was there he played golf for as much as three days at a time and otherwise acted as a normal man. Before he returned he wrote to Tristam Shook, manager of the Retail Merchants' Association, Louisville, a letter which for clearness and precision and composition is a model. This letter, by its perfection, contradicts in a very large part and in a very conclusive way much of the testimony given by appellant Moise upon the trial; and further contradicts in words his testimony, for the letter says: ''Am very thankful to say that I am now beginning to show some real improvement, and at present I hope and expect to be able to return about the middle of January.'' This letter bears date December 27, 1917, and reads as follows:

''December 27th, 1917.

''Mr. Tristam Shook, Manager,
    Retail Merchants' Association.

''Dear Shook:

''When I came to Asheville I had no expectation of remaining longer than two weeks, but the condition of my health has necessitated a much longer stay. Am very thankful to say that I am now beginning to show some real improvement, and at present writing hope and expect to be able to return about the middle of January.

''The annual meeting of the association takes place, I believe, on the fifteenth of January and it is my earnest wish to be back in time for same. However, it is hardly likely that I will do so earlier than the fourteenth inst., which would give me no time or opportunity to prepare the report of the president reviewing the association's work, activities, and achievements during the past year. I will ask you therefore to go over the year's work and in your usual concise, clear-cut manner make up such report for any use and guidance. If I am so fortunate as to be there I shall probably have to make the report just as you have written it.

''I should have written you before now except that I have not really been well enough to tackle much letter writing.

"I hope you had a very happy Christmas and trust you will convey to the individual members of the board and the association my regards and very best wishes. Wishing you a happy and healthy new year, I am,

"Sincerely yours,
M. H. MOISE."

In his testimony on this trial Mr. Moise says he was quite sick in November and that he steadily grew worse from that time on until after the sale of his stock, and that while he was at Asheville, at the time this letter was written, his condition had become so serious that it was impossible for him to do anything or to attend to any business whatever. But we have no doubt from the reading of the foregoing letter that one who could compose and write such a letter was not only of sound mind but very much more capable of understanding and dispatching business than ninety per cent of the business public. After staying at Asheville only a short time he returned to Louisville and then went to a sanatorium at Battle Creek, where he was treated by Dr. Fournodigiff from March 28, 1918, to April 7, 1918, leaving there only a short time before making the contract of which he now complains, and this alienist and renowned specialist upon nervous and mental diseases testifies that appellant Moise was suffering from what is commonly known as "melancholia," which disease undermines the will-power but does not destroy the memory or reasoning faculties of the mind; that one suffering from this disease has no power of resistance, although he has mind and memory sufficient to recall and reason as a normal person. He further testified that appellant Moise was suffering from no delusions but that he seemed to appreciate and understand existing things thoroughly and that he did not evidence any hallucinations. This famous alienist was then asked:

"Q. Confining yourself to actions entirely and to his talk, did he ever become irrational? A. No, during his stay at the sanatorium he did not do anything irrational."

As a fine illustration of what appellant Moise's trouble was, as found by this witness, we will quote some of the questions propounded to him and his answers:

"Q. Now if he had a house and lot, and some fellow offered him $10,000.00 for it, he would understand it, wouldn't he? A. Yes, sir, he would. Q. And if he concluded to let it go he would know he was selling it at that

price, wouldn't he? A. Yes, but the condition of his will-power and his judgment was such as he was apt to make serious mistakes and could not always protect himself or his family. Q. Do you know any rational person who is always able to protect himself in a deal, if you mean by that, making a good deal? A. Rational persons are apt to make mistakes. . . . Q. Waiving all questions of judgment which is, as I understand the point you are considering, Mr. Moise thoroughly understood the facts relative to the matter? A. Any fact that would be relating to him, I cannot say he always understood. Q. Was not Mr. Moise a man of infinite details? A. At times he was.''

Further testifying the doctor said: ''In our examination we found Mr. Moise's memory was fair.'' Then he was asked: ''Q. What did you have to check his memory by? A. We inquired about his memory as to distant events, and as to memory for recent events.'' In explanation of the foregoing the doctor said: ''He gave us a fairly good account of his past.''

While at Battle Creek appellant Moise though under the care of a physician, was allowed to go about the premises as any normal person would have been.

Dr. Boggess, of Louisville, also testified that he had treated appellant Moise for some weeks shortly before the transfer of the stock, and said in substance that Moise's memory of past events was good, and that his memory was as clear as could be on details of past events, and that Moise experienced no difficulty in telling another the details of any business with which he had connection and that he could go into minute details of each transaction, and that he knew the value of things, especially property owned by him.

From the evidence quoted one is forced to the conclusion that while appellant Moise was physically deficient, yet he had mind and memory sufficient to enable him to enter into ordinary contracts, especially in the quiet at his home, to appoint an agent, or do any other ordinary business.

Norvin Green was the close personal friend and adviser of appellant Moise for many years next before and at the time of the transfer of the stock. Green is, according to the record in this case, a man of high character and acknowledged business ability. He was the president of a great corporation. He and appellant Moise had been intimate friends since their youth; they gradu-

ated from high school together and after that they lived or roomed together for some years until appellant Moise married. They consulted one another about business affairs and advised one another about such matters. When appellant Moise became sick Green visited him regularly and talked to him about his business affairs and consulted with Mrs. Moise concerning the condition of her husband. It was the hope of Green that Moise would soon recover if given a rest from business worries, and with this idea in mind he and Mrs. Moise advised Moise to go to Asheville, North Carolina, for treatment, and this advice was accepted. Before they did this they called in all of the local physicians whom they thought might give Moise relief. Through all of his nervous trouble these two persons, Mrs. Moise and Norvin Green, stood steadfastly and unswervingly by appellant Moise, giving him the best attention and advice within their power. Green knew something of the business of Moise and one day when he was in one of the banks of Louisville he, by chance, met Granville L. Burton, one of the younger members of the Burton family, and Burton after some conversation inquired about Moise. Then Green suggested to Burton that he and his firm buy the stock of Moise, but Burton did not seem inclined to the idea, rather insisting that business was dull and that the firm did not have the money with which to pay for the stock. Before parting, however, Green agreed to see Moise and see and find out what price he wanted for his stock and to give that price to Burton with the idea that some trade might eventuate. In a few days they met again and Green told Burton that Moise had authorized him to price the stock to Burton at $90,000.00 for the 400 shares; this price was rejected by Burton as being too high and perhaps upon the further ground that he and his brother could not raise that much money. After some conversation between Green, as agent of Moise, and Burton concerning the stock, it was agreed that Green should see his friend Moise again and find out if there was any better price at which the stock could be had. Perhaps at that meeting Burton made a tentative offer of $50,000.00 for the stock. At any rate they separated without any trade, and Green again consulted his principal Moise and got a price of $75,000.00, which he presented to Burton and which the Burtons rejected; these negotiations were going on for about thirty days, Green on behalf of Moise trying to get as high a price as possible for the stock, and

Burton trying to buy the stock at as low a price as possible. Finally they agreed upon the price of $60,000.00 for the 400 shares of stock; thirty thousand ($30,000.00) dollars cash in hand paid, and the balance in instalments represented by interest bearing notes. Neither of the Burtons had seen or conversed with appellant Moise. He was at his home in the bosom of his family; and his friend, Green, deeply interested in his welfare, was a constant visitor. They talked of the matter of selling the stock at the home of appellant Moise, and Moise gave the instructions and directions to Green concerning the making of the price. While Moise did want to sell or part with his stock he felt is was necessary for him to do so in order to regain his health. He was so advised by both his wife and his friend Green. After the arrangements had been made for the sale of his stock appellant Moise and wife and Norvin Green at the time appointed went to the office of Crutcher & Starks where they met the Burtons, who are now appellees. The contract as prepared was but an amplified bill of sale of the stock. At that time, according to the witnesses, appellant Moise appeared to be normal. He acted just as other men act under like circumstances, and the contract was deliberately prepared and read over by different persons in the office, including appellant Moise and his agent Norvin Green. The contract reads:

"This agreement made and entered into at Louisville, Kentucky, by and between M. Haden Moise, party of the first part and Crutcher & Starks (a corporation) party of the second part,

"WITNESSETH: That said first party in consideration of the sale of all the common stock of the Crutcher & Starks Company, held by him, which is this day sold in equal parts to Granville L. Burton and Ferrell Burton, and the further consideration of the payment of all salary due him by the second party, including salary for May, 1918, receipt of which is hereby acknowledged, does hereby resign as vice-president and treasurer of said Crutcher & Starks and as a director of said company, and does hereby release said company, party of the second part, from any and all claim for salary or compensation or from any right to be employed by said second party now or in the future, and does hereby release and waive any claim or demand that any portion of the stock of said company belonging to Granville L. Burton or Ferrell Burton to be held in escrow as per former agree-

ment entered into with the said second party or said Burtons; and said second party, Crutcher & Starks, does hereby release the said Moise, party of the first part, from any contracts, agreements or claims for his services, or other claims
heretofore entered into, and particularly from any forfeiture or agreement in accordance with a contract entered into by and between the parties hereto on October 4, 1916.

"Witness our hands this the 17th day of May, 1918.

"M. H. Moise,
Party of the first part.
"Crutcher & Starks,
By G. R. Burton, Pres.
Party of the second part."

After reading the contract carefully appellant Moise made an interlineation therein, which will be observed in the foregoing copy, the words being "or any other claims," which interlineation was intended to and did in fact protect Moise from any outstanding claims on account of his relation with the corporation and the Burtons. This interlineation shows that Moise had read the contract understandingly, and to make assurance doubly sure he added to that part of the contract reading "said second party, Crutcher & Starks, does hereby release the said Moise, party of the first part, from any contracts, agreements of claims for his services," to which he added "or other claims." In other words, he was absolutely released from all obligations to Crucher & Starks and the Burtons and saved himself from both by the transfer of this stock.

It is complained that appellant Moise was not fairly dealt with by the Burtons and that his agent Green was misled and deceived by the Burtons in that Moise on account of his nervousness did not remember and was unable to tell his agent Green that by a certain written contract of date September 28th, 1916, the Burtons on the one hand and Moise on the other had agreed to trustee a certain number of shares of the capital stock of the company with a banker, S. B. Lynn, as trustee so as to prevent the Burtons from overreaching or oppressing Moise in the conduct of the business, and to prevent Moise from overreaching or injuring the Burtons in the conduct of the business. Lynn having the balance of power in the corporation for the election of officers, fixing of salaries, the declaration of dividends and all other

matters coming before the board of directors, made it absolutely safe for all shareholders. It is also insisted that appellant Moise by reason of his mental state did not remember and did not inform his agent Green of the existence of another contract between Crutcher & Starks and appellant Moise, of date October —, 1916, whereby the said corporation employed appellant Moise as vice-president and treasurer of the company for a term of five years from October 1, 1916, at a salary of $5,000.00 per year, payable monthly, which said contract was still in existence and enforceable and under which Moise was regularly receiving his monthly salary. It is argued that if Moise had remembered these two contracts and had presented his copies to his agent Green, a good business man, Green would not have advised him to sell the stock in question because he would have known and understood that there was no way by which the Burtons could have withheld the salary from appellant Moise nor the dividends on stock which was owing to Moise, and that seems to be sound logic if the premises are correct. But in as much as substantially all the evidence, except that of appellant Moise himself, and many circumstances of controlling importance tend to show that Moise was possessed of good memory at all times during his sickness, especially about the time of the making of this contract, it is hard to agree with counsel for him that he did not remember these two very important papers. According to the evidence of his witnesses he had a mind capable of remembering and recalling infinite details all of less importance than these contracts. According to the evidence of Moise he had quite a struggle covering several weeks with the Burtons to obtain a contract trusteeing part of the stock for the purpose of maintaining a balance of power and securing himself against imposition from the Burtons. Having gone through this only a year or so before the sale of the stock, and had reduced the contract to writing, retaining a copy of it for his own use, we think the jury was fully justified in arriving at the conclusion that he had not overlooked that contract when he came to sell the stock. More potent still is the fact that each of said contracts was mentioned in the writing transferring the stock, which was carefully read and studied by both Moise and Green before it was signed and before the stock was transferred or Moise was under obligations to do so. It would be strange indeed if his mind and memory which retained frivolous

details should have lapsed on the contract with reference to his salary of $5,000.00 per year payable monthly, and which he had been receiving constantly from the time of the making of the contract up to that very date even though he had not been able to attend to business. The contention, therefore, of counsel for appellant Moise that Moise only yielded to the proposal of his friend Green to sell the stock after he became frightened lest the Burtons should take an unfair advantage of him and by a vote of the directors of the corporation cut off his salary, and withhold his dividends does not carry much force. The Burtons had no power to do either. Neither did they seek so to do, as far as this record discloses. The appellees were not the aggressors in the making of the trade for the stock but rather sought to postpone it if not to decline altogether to buy it until Green, the agent of Moise, pressed the matter and induced them to become the purchasers. All these facts considered, we think the verdict of the jury is sufficiently sustained by the evidence.

Appellant Moise through counsel offered two full sets of instructions presenting two different theories of the case. The first instruction "A" which was offered, reads as follows:

"A. The jury are instructed that if at the time of the sale of his stock on May 17, 1918, the plaintiff did not have sufficient mental capacity to understand his business affairs and rights or to protect himself from being imposed upon in the sale of his stock in Crutcher & Starks and that said Granville L. Burton and Ferrell Burton, with knowledge of such mental condition, imposed upon said Moise by purchasing his said stock for less than its real value, then the law is for the plaintiff, Moise, and the jury will so find against all the defendants if the purchase of the stock was for the benefit of all of them, or against Granville L. Burton and Ferrell Burton if the purchase was made for their benefit only; otherwise the jury will find for defendants."

The court rejected instruction "A" with the one on the measure of damages and one directing the jury that nine or more could make a verdict, which formed a complete set of instructions. Later appellant Moise through counsel offered instructions numbers 1, 2 and 3; of these 2 and 3 are the same as "B" and "C" of the first set of instructions designated "A;" and number 1 presented to the jury not only the theory covered by instruction

"A" but other phases of the case. After the appellees had an opportunity to offer several instructions which the court rejected, the court on its own motion prepared and gave instructions Nos. 1, 2 and 3. Instruction No. 1, given by the court is in substance and effect the same as instruction No. 1 offered by appellant, and this is admitted in brief of appellant. Instructions Nos. 2 and 3 given by the court are the same as instructions Nos. 2 and 3 and "B" and "C" offered by appellant.

It is earnestly insisted by counsel for appellant that instruction "A" should have been given either alone or in conjunction with instruction No. 1 offered by appellant, and it is said in brief of appellant that appellant is not complaining of instruction No. 1 given by the court, nor of the refusal of instruction No. 1 offered by appellant, but appellant "earnestly insists that instruction 'A' which the court refused should have been given and we stake our case upon that position." We have read and reread carefully instruction "A" and instruction No. 1 offered by appellant as well as instruction No. 1 given by the court to the jury, and it seems to us that the substance of the instruction "A" is fully emboded in instruction No. 1 given by the court, for it will be noticed that the substance of instruction "A" directs the jury to find for appellant Moise if at the time of the sale of the stock, on May 17, 1918, (1) Moise did not have sufficient mental capacity to understand his business affairs and rights, or (2) to protect himself from being imposed upon in the sale of his stock, and (3) that the Burtons with knowledge of such mental condition imposed upon Moise by purchasing his stock for less than its real value. Instruction No. 1 given by the court directs the jury that if at the time appellant Moise sold his common stock to the Burtons for $60,000.00, the said Moise was (1) by reason of a severe and protracted nervous breakdown unable to grasp and understand his rights or his business affairs, including the value of his said stock, or (2) to protect himself from being imposed upon in the sale of said stock, or (3) if said Moise by reason of his mental condition was unable to understand his rights as to said stock, or was unable to protect himself from being imposed upon by the Burtons in the sale of his stock, the verdict should be for the plaintiff Moise. While the instruction presented another phase of the case, it does present very concisely and completely the phase of the case covered by instruction "A."

One of the best texts on the subject says:

"A party is bound by the position he assumes on the trial in reference to any particular matter and will not be heard to complain of the action of the court in taking the same position. Hence the rule is universally accepted that a party cannot complain of an instruction given at his own request, or of error in an instruction given at the instance of his adversary when the others given at his request contain the same vice, or when he requests a substantially similar one." 14 R. C. L., p. 815. This text is supported by many other authorities. Central Ry. Co. v. Coley, 121 Ky. 385.

As there was ample evidence on either side of the case to have supported a verdict of the jury, and in as much as the law of the case as given by the court in its instructions was in substance and effect the same as that presented by appellant, there exists no sound reason for a reversal of the judgment, and it is therefore affirmed.

Judgment affirmed.